IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* LYNDA WALLS, | ) | |
| | ) | C.A. No: <u>6:11-917-JMC</u> |
| Plaintiff, | ) | |
| | ) | **FILED UNDER SEAL** |
| v. | ) | **DO NOT PLACE IN PRESS BOX** |
| | ) | **DO NOT ENTER ON PACER** |
| UNITED HOSPICE, INC., | ) | |
| | ) | **DEMAND FOR JURY** |
| Defendant. | ) | |

### *QUI TAM* **COMPLAINT**

Plaintiff-Relator, Lynda Walls, on behalf of herself and the United States of America, alleges and claims against United Hospice, Inc., as follows:

### JURISDICTION AND VENUE

1.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act").    Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.    Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.     Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendant qualifies to do business in the state of South Carolina, transacts substantial business in the state of South Carolina, transacts substantial business in this judicial district, and can be found here.  Additionally, and as  described

herein, Defendant committed within this judicial district acts proscribed by 31 U.S.C. § 3729. Specifically, and *inter alia*, Defendant submitted and caused to be submitted within this judicial district false claims for Hospice care for ineligible patients and false claims for palliative care which should have been paid for by Defendant and made or used false records material to such claims.

3.    Assignment of this case to the Greenville Division of this Court is appropriate under Local Civil Rule 3.01(A) because a substantial part of the events or omissions giving rise to the claims described herein occurred in this division.

## PARTIES

4.    Defendant United Hospice, Inc. ("United Hospice" or "Defendant") is a Medicare-certified Hospice provider offering Hospice services in several South Carolina counties from its locations in Chester, Simpsonville, and Florence, South Carolina. United Hospice is a subsidiary of UHS Pruitt Corporation, which offers healthcare services, including nursing home care, in Georgia, South Carolina and North Carolina.

5.    Plaintiff-Relator Lynda Walls ("Plaintiff-Relator" or "Ms. Walls") has a total of nine years of Hospice clinical experience. She was employed by United Hospice as a travel nurse in January, 2010. She resigned in November, 2010. Prior to that, Ms. Walls was employed as a clinical nurse by SouthernCare, Inc., for eight years. In her time at United Hospice, Ms. Walls has witnessed countless

2

instances of knowing, willful fraud committed with the intent of falsely inflating Medicare billing and illegally shifting costs onto the Medicare program. Specifically, Ms. Walls has become personally familiar with Defendant's practices of admitting and billing for non-terminal, ineligible Hospice patients and of falsely "revocating" legitimate Hospice patients who require expensive palliative care.

6.      Through her experience, Plaintiff-Relator has witnessed so many instances of fraud as to believe that Defendant's fraudulent tactics are widespread, systematic practices endemic to this Defendant.   Defendant's fraudulent conduct offends Plaintiff-Relator's long-standing dedication to the mission of Hospice care and to the needs of terminally-ill patients and causes her to file this Complaint on behalf of herself and the United States as a relator under the *qui tam* provisions of the False Claims Act.

7.      Prior to filing this Complaint, Plaintiff-Relator voluntarily disclosed to the Government the information upon which this action is based.    To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A), Plaintiff-Relator is the original source of the information for purposes of that section.   Alternatively, Plaintiff-Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Plaintiff-Relator voluntarily provided that information to the Government before filing this Complaint.   Plaintiff-Relator is concurrently serving on the United

States a written disclosure of the material evidence and information upon which this claim is based.

## THE MEDICARE HOSPICE BENEFIT

### I.    Background

8.    Through the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., the United States provides health insurance coverage for eligible citizens. Medicare is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

9.    Through the Medicare Hospice Benefit (Hospice), Medicare pays for Hospice care for certain terminally-ill patients who elect to receive such care. *See* 42 U.S.C. § 1395d.    A patient is deemed to be terminally ill if the patient "has a medical prognosis such that his or her life expectancy is 6 months or less if the disease runs its normal course."    42 C.F.R. § 418.3.    In electing Hospice care, a patient must agree to forego Medicare coverage for curative treatment.    *See* 42 U.S.C. § 1395d.    A patient may at anytime revoke his or her Hospice election and resume Medicare Part A coverage.    42 C.F.R. § 418.28.

10.    Defendant's aggressive, profit-maximizing business model represents an intrusion of greed into an institution founded upon philosophical, spiritual, and medical notions of charity and care-giving.    The impetus for the modern Hospice

4

movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 *On Death and Dying* is acknowledged to have altered modern perceptions about care for the terminally ill.   In the 1970s, U.S. Hospices opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminal patients.   Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the families and the patients the spiritual, emotional, and financial help in order to facilitate the final care at home."   In 1982, Congress created a provisional Medicare Hospice Benefit, made permanent in 1986.   By 1990, 800 Hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

11.    From such humble, altruistic roots, Hospice has become big business. Medicare Hospice payments rose from $205 million in 1989 to $9.2 billion in 2006.   In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the *New York Times* recognized that the Hospice infrastructure "was never designed to handle the expanding network of nursing homes, Hospices, assisted-care centers and other services popping up to serve the nation's growing aging population." Venture capitalists and other investors have been quick to perceive that Hospice

represents a potentially unlimited stream of income for those who bring aggressive marketing, sales, and growth tactics into the new industry of care for the dying.

12.    Leslie Norwalk, then Acting Director of the Centers for Medicare & Medicaid Services, testified before the U.S. House of Representatives Committee on Ways and Means in 2007 that "Hospice is not intended to be used as a nursing home."  Nevertheless, Defendant and other for-profit Hospice companies have instituted a fraudulent scheme to treat the Medicare Hospice Benefit as an improper subsidy for general nursing home and in-home care and to capitalize on and aggressively market to the nation's rapidly growing elderly population.

## II.    Hospice Benefits, Reimbursements, and Requirements

13.    Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician.  *See* 42 C.F.R. § 418.22.  Hospice is designed to provide pain-relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis.  Qualified Hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness.  *See* 42 C.F.R. § 418.202.

6

14.    Through Medicare and/or Medicaid (indirectly through the States), the United States reimburses Hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled.    42 C.F.R. § 418.302.    Medicare or Medicaid makes a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided.    Payments are made according to a fee schedule with four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), in-patient respite care (IRC), and general in-patient care (GIC).

15.    In return for the Hospice *per diem* payment, Hospices are obligated to provide patients with all covered palliative services.    *See* 42 C.F.R. § 418.202. The Hospice must design a plan of care inclusive of all covered services necessary to meet the patient's needs.    *See* 42 C.F.R. § 418.56.    Among other services, every Hospice must provide short-term inpatient care for pain-control and symptom-management related to the patient's terminal illness.    *Id.*; *see also* 42 C.F.R. § 418.108.

16.    Medicare will not pay for Hospice services provided to patients who are not terminally ill.    *See* 42 U.S.C. §1395y.    Furthermore, it is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary.    *See* 42 U.S.C. §1395y(a)(1)(A); 42 U.S.C. § 1396, *et*

*seq.*; 42 C.F.R. § 410.50.   Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for the profit of the provider.   *Id.*

17.    Federal law authorizes Medicare administrative contractors ("MACs") and fiscal intermediaries ("FIs") to issue determinations as to the extent of Medicare coverage for particular items or services.   *See* 42 U.S.C. 1395ff. Accordingly, Medicare Hospice MACs and FIs publish local coverage determinations ("LCDs") establishing requirements for and limitations on Hospice coverage.   Medicare will not pay for Hospice care provided to a patient who does not meet LCDs.   *See* 42 U.S.C. 1395y.

18.    To enroll as a Medicare provider, Defendant was required to submit a Medicare Enrollment Application for Institutional Providers.   *See* CMS Form 855A.   In submitting Form 855A, Defendant made the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

19.    Defendant then billed Medicare by submitting a claim form (CMS Form 1450) to the FI responsible for administering Medicare Hospice claims on behalf of the United States.   *See* CMS Form 1450.   Each time it submitted a claim to the United States through the FI, Defendant certified that the claim was true, correct, and complete, and complied with all Medicare laws and regulations.

20.    Defendant thus certified that each claim for a Hospice *per diem* payment represented a day of care provided to a terminally ill patient, and CMS expressly conditioned its payment on the truth and accuracy of that certification. Defendant further certified that its programs were in compliance with Medicare regulations, including the requirement that Defendant provide short-term in patient care related to its patients' terminal conditions.

### DEFENDANT'S FRAUDULENT SCHEMES

### I.    Billing for Ineligible Hospice Patients

21.    Defendant systematically defrauds Medicare and Medicaid by recruiting and cycling non-qualifying patients through its Hospice program.

22.    Defendant actively recruits, certifies, and bills the United States through CMS for ineligible patients.   United Hospice Administrator Paula Holmes sees to it that nearly every patient referred to Defendant is admitted,

9

regardless of eligibility, by training the staff to focus solely on the recruitment of new Medicare patients, without regard to their qualifications.

23.    Holmes maintains the stated authority to overrule any clinical assessment that fails to result in a Hospice admission.    Holmes told Plaintiff-Relator Walls that she would "go through hell," if she found any patient to be inappropriate for Hospice.    Holmes also told Ms. Walls that a patient referral is the equivalent of an admission and that if Ms. Walls considered rejecting anyone as ineligible for Hospice, she needed Holmes's personal approval.    In fact, Holmes requires that the United Hospice assessment coordinator advise her on every potential declination so that Holmes can intervene and see that the patient is admitted despite non-qualification.

24.    In order to perpetrate and conceal United Hospice's fraud Holmes instructs United Hospice employees to "chart negative" – that is, to falsify assessments and nursing notes to create the fraudulent appearance that the patients are terminal and are in decline.

25.    The result of Defendant's practices is that many of its patients do not qualify for Hospice care and their care is falsely billed to the United States through Medicare.    The following are merely representative examples of the Defendant's fraudulent practices.    These patients' conditions belie a terminal diagnosis and do

not comport with LCDs, yet they have been fraudulently certified by Defendant as terminally-ill and falsely billed to the United States through CMS:

a.  Patient A.W. is suffering from Alzheimer's Disease. Although sometimes disoriented, he can feed himself and walk to the bathroom unaided when necessary.   A.W. was admitted on April 27, 2010 and re-certified for admission on October 2, 2010.   United Hospice Medical Director Dr. Andrew McCraw acknowledged that A.W. "should be discharged" but admitted him anyway under the Alzheimer's diagnosis.   A.W. did not meet Hospice criteria as terminal in 2010.

b.  Patient C.G. is suffering from Alzheimer's Disease.   Although sometimes disoriented, he has the ability to feed himself and walk without assistance.   When informed that C.G. did not qualify for Hospice care, then-Administrator Cynthia Smoot stated, "He'll probably decline."   C.G. did not meet Hospice criteria for terminal illness but was admitted and billed to the United States despite his non-qualification.

c.  Patient J.E. was admitted prior to July, 2009, under a diagnosis of prostate cancer.   He reported no pain and no nausea.   He was receiving no cancer treatment therapy.   Aside from aging,

there was no decline in his physical condition.   J.E. does not qualify as terminal but remains on United Hospice's rolls and his care is billed to the United States.

d.     Patient X. was admitted prior to July, 2009, under a diagnosis of Parkinson's Disease.   X. regularly rides a tractor and routinely works on his farm.   On a home visit in 2010, when asked his whereabouts, his wife stated, "He's out in the barn." X. does not have a legitimate terminal diagnosis and does not qualify for Hospice.

e.     Patient H.S. was admitted on or about June 29, 2010, under a diagnosis of cancer.   Plaintiff-Relator found H.S. to be alert and stable and documented "no weight loss" and "responsive to stimulation."   Medical Director Dr. McCraw altered the notes, stating, "You can't tell me this lady hasn't had a urinary tract infection or that she is alert" and, "If you want to keep your patients, you need to watch them better."   H.S. was then recertified for 60 more days in or around October, 2010.

f.     Patient R.G. was admitted to United Hospice in September, 2010 under a diagnosis of Multiple Sclerosis.   R.G. had been referred by "Dr. B" even though the assessment revealed R.G.

was alert and oriented.    R.G. could attend to activities of daily living in no distress and even told Plaintiff-Relator he did not need Hospice.    Although R.G. did not qualify as Hospice terminal, Administrator Holmes ordered R.G. admitted stating, "We need to get in good with "Dr. B."    Holmes ordered staff to "find a reason" to admit R.G.

## II.    Eliciting and Backdating Fraudulent Revocations for Legitimate Hospice Patients who Require Hospitalization for Palliative Care

26.    Defendant fraudulently increases its profits and shifts costs to the United States through a pattern and practice of fraudulently "revocating" legitimate Hospice patients who require expensive palliative hospital care and "backdating" paperwork to evade responsibility for costly procedures.    Once a patient is admitted, Hospice requires that Defendant bear any costs for that patient's palliative care, *i.e.*, pain management and symptom control related to the patient's terminal illness.    *See* 42 C.F.R. §§ 418.56; 418.108; 418.202.    The Hospice per-diem rate paid by the United States to Defendant, however, is generally much less than the actual per-diem cost of even a routine hospital stay for palliative treatment.    Unwilling to absorb such high costs of hospital care, Defendant fraudulently shifts these costs to the United States through forced, fraudulent revocations.

13

27.     Defendant effectuates its scheme by revoking any patient who visits or plans to visit the hospital ER.   When a Hospice patient is admitted to the hospital for treatment – for any reason, including for palliative care, pain relief, or symptom management related to the patient's terminal diagnosis – Defendant directs its employees to go to the hospital and coerce the patient or family to sign the revocation form and ABG Medicare forms so that cost of the hospital treatment will be borne by the United States rather than by Defendant.   Defendant typically misinforms patients about the extent of their Hospice coverage in order to "revocate" them – Defendant instructs its staff to falsely inform patients that if the patients do not sign the revocation forms, they will be charged for the hospital stay.

28.     When patients are hospitalized without notice to Defendant and undergo expensive procedures before Defendant can fraudulently "revocate" the patient, Defendant simply "backdates" the revocation form so that the revocation appears to have taken place prior to the hospital stay.   The cost of care which should be borne by Defendant is then borne by the United States through Medicare Part A or Medicaid.   As a result of the scheme, the United States pays a full Medicare fee-per-service rate for care that it has already contracted for at the lower Hospice per-diem rate.

29.     For example, Patient S.C. was admitted to United Hospice in 2010 under a diagnosis of Chronic Obstructive Pulmonary Disease.   S.C. met the

Hospice criteria of declining rapid terminal illness but required hospitalization for lung fluid treatment – a condition plainly related to S.C.'s diagnosis of C.O.P.D. Nonetheless, United Hospice "revocated" S.C. because of the required hospital care and in order to avoid the cost of S.C.'s care.

30.    S.C. is just one of many examples of fraudulent cost shifting by United Hospice through improperly coercing patients to revocate for hospital treatment.

31.    By and through all of the circumstances described, *supra*, Defendant has violated the healthcare laws and regulations of the United States, undermined the noble intention and mission of Hospice, defrauded the United States of America, and jeopardized the already strained Medicare program.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS UNDER 31 U.S.C. § 3729

32.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

33.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

(a)    Defendant submitted false claims for Hospice care provided to patients whom Defendant knew did not meet Medicare or Medicaid requirements for Hospice, in violation of 42 U.S.C. §1395y;

(b)    Defendant submitted false claims for Hospice care provided to patients who were not properly assessed by an RN and in the absence of a legitimate care plan as required by 42 C.F.R. §§ 418.201; 418.56;

(c)    Through fraudulent revocations, Defendant caused hospitals and other healthcare providers to submit false claims under Medicare Part A or Medicaid for care that should have been paid for by Defendant by reason of its obligations as Medicare Hospice providers under 42 C.F.R. §§ 418.201, *inter alia*; and

(d)    Defendant submitted false claims for Hospice services premised upon Defendant's fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere.

34.    The United States paid the false claims described herein and summarized in Paragraph 33, including subparagraphs (a) through (d).

35.    Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of Hospice patients and fraudulent billing of the United States through Medicare or Medicaid.

36.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare and Medicaid for such false or fraudulent claims.

## COUNT TWO
## MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729

37.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

38.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a)    Defendant created and used false certifications of terminal illness; false patient care plans not calculated to cope with

17

patients' actual needs and conditions; and other false records intended to support its fraudulent billing to the United States, all in violation of 42 U.S.C. §1395y and the Medicare regulations cited *supra*;

(b)  Defendant made false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid, including false certifications on CMS Forms 885A and 1450 as described *supra*, when Defendant was aware that its practices as described herein were in violation of Medicare payment prerequisites, including but not limited to 42 U.S.C. §1395y and the applicable LCDs; and

(c)  Defendant made or used or caused to be made or used fraudulent revocation forms intended to create the false appearance that patients required and elected to receive aggressive curative treatment when in fact the patients never truly revoked their Hospice election, the treatment required was palliative in nature and should have been paid for by Defendant pursuant to 42 C.F.R. §§418.201; 418.56, *inter alia*, or both.

39.    The false records or statements described herein and summarized in Paragraph 38, including subparagraphs (a) through (c), were material to the false claims submitted or caused to be submitted by Defendant to the United States.

40.    In reliance upon Defendant's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

41.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States for such false or fraudulent claims.

## COUNT THREE
## "REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(a)(1)(G)

42.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

43.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, a false records or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:

(a)     Defendant knew that it had received millions of dollars in Hospice *per diem* payments for patients who did not qualify for Hospice, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States; and

(b)     Defendant knew that the United States had paid millions of dollars for palliative hospital in-patient treatment that should have been paid for by Defendant, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States.

44.     As a result of Defendant's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

## COUNT FOUR
## FRADULENT INDUCEMENT UNDER 31 U.S.C. § 3729

45.     Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

46.     By and through the actions described herein, Defendant knowingly presented, or caused to be presented, to the United States false or fraudulent

claims, to wit: Defendant fraudulently induced the United States to pay per-patient *per-diem* fees for patient care that Defendant never intended to provide.

47.     Through submission of CMS Form 855A and otherwise, Defendant agreed to provide care to patients in return for a per-patient *per-diem* payment from the United States through CMS. By regulation, including 42 C.F.R. § 418.201, United States made it clear that such per-patient *per-diem* payments were consideration for Defendant's agreement to provide ongoing, complete palliative patient care; and Defendant's agreement to provide such ongoing, complete palliative care was – in fact – a condition of the United States' per-patient *per-diem* payments to Defendant.

48.     At the time that Defendant requested and accepted the per-patient *per-diem* payments, it intended to avoid the high costs of palliative-care procedures and medications by using false documents to create the appearance that patients had temporarily revoked their Hospice election, in order that such expensive procedures should be billed under Medicare Part A.

49.     Accordingly, the United States was misled by Defendant's material misrepresentation that it would provide palliative care for such patients, which Defendant ultimately avoided through fraudulent revocation. In many instances, after the expensive procedures were completed the patients were fraudulently re-certified for Hospice.

50.    By and through the actions described *supra*, Defendant knowingly made, used, or caused to be made or used, false records or statements, including but not limited to fraudulent revocation documents and back-dated revocation records and false claims for payment to the United States related to the per-patient *per-diem* claims for payment. Such false records or statements were used by Defendant to get false or fraudulent claims paid or approved by the United States.

51.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the payments made to Defendant and others by the United States through Medicare for all patients whose Hospice election was fraudulently revoked.

## COUNT FIVE
## CONSPIRACY UNDER 31 U.S.C. § 3729(a)(3)

52.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

53.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment or approval, to-wit: Defendant knowingly certified and/or re-certified Hospice patients whom it knew did not qualify for Medicare or Medicaid reimbursement and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

54.    The United States paid Defendant for such false claims.

55.    Defendant, in concert with its principals, agents, employees, subsidiaries, and other institutions did agree to submit such false claims to the United States.

56.    Defendant and its principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare or Medicaid.

57.    Defendant's fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to Defendant and others as a result of Defendant's fraudulent claims.

## COUNT SIX
## SUPPRESSION, FRAUD, AND DECEIT

58.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

59.    Defendant misrepresented or suppressed the material facts that (1) a substantial number of its patients enrolled in Hospice do not qualify for Hospice and are not terminally ill and (2) Defendant created and submitted numerous false revocation forms for patients who never made a true revocation of their Hospice election and who in fact required only palliative care.

60.    Defendant was legally obligated to communicate these facts to the United States.

61.    Such misrepresentations were made willfully to deceive or recklessly without knowledge.

62.    The United States acted on Defendant's material misrepresentations described herein to its detriment.

63.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid by the United States as a result of Defendant's fraudulent claims.

## JURY DEMAND

Plaintiff-Relator hereby demands a trial by struck jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator respectfully prays that this Court:

1.    Render judgment in favor of Plaintiff-Relator on behalf of the United States, and against Defendant, on Count One in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled:

24

2.      Render judgment in favor of Plaintiff-Relator on behalf of the United States, and against Defendant, on Count Two in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled;

3.      Render judgment in favor of Plaintiff-Relator on behalf of the United States, and against Defendant, on Count Three in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled;

4.      Render judgment in favor of Plaintiff-Relator on behalf of the United States, and against Defendant, on Count Four in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled;

5.      Render judgment in favor of Plaintiff-Relator on behalf of the United States, and against Defendant, on Count Five in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Plaintiff-Relator may be entitled;

6.    Render judgment in favor of Plaintiff-Relator on behalf of the United States, and against Defendant, on Count Six pursuant to 31 U.S.C. § 3732 in an amount sufficient to compensate the United States for Defendant's fraud, suppression, and deceit, together with punitive damages in an amount calculated to deter Defendant from engaging in such conduct in the future, along with attorneys' fees, costs, interest, and any other, further, or different relief to which Plaintiff-Relator may be entitled.

7.    Grant such other relief as this Court may deem just and proper.

Date: April 18, 2011.

WOOD JACKSON PLLC

/s/   J. Gary Eichelberger, Jr.
J. Gary Eichelberger, Jr.
Federal Bar No. 7865
301 Glenwood Ave, Suite 280
Raleigh, North Carolina 27603
Telephone: (919) 829-7394
Facsimile:    (919) 829-7396
geichelberger@woodjacksonlaw.com

FROHSIN & BARGER LLC

James F. Barger, Jr.,
     (*Pro Hac Vice* Motion to Be Filed)
One Highland Place
2151 Highland Avenue, Suite 310
Birmingham, Alabama 35205
Telephone: (205) 933-4006
Facsimile:    (205) 933-4008

jim@frohsinbarger.com

Attorneys for Plaintiff-Relator
Lynda Walls

## CERTIFICATE OF SERVICE

On this the 18th day of April, 2011, counsel for Plaintiff-Relator hereby certifies that in compliance with Federal Rule 4 of the Civil Rules of Procedure, service of the *Qui Tam* Complaint has been executed as follows:

**By Certified Mail/Return Receipt to:**

William N. Nettles, United States Attorney
Office of the Attorney General
1441 Main Street
Suite 500
Columbia, SC    29201

Attorney General of the United States of America
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

/s/    J. Gary Eichelberger, Jr.
J. Gary Eichelberger, Jr.
Federal Bar No. 7865
301 Glenwood Ave, Suite 280
Raleigh, North Carolina 27603
Telephone: (919) 829-7394
Facsimile:    (919) 829-7396
geichelberger@woodjacksonlaw.com

28